UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SUSAN J. GUYETT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:10-cv-0519-RLY-DML |
| | ) | **UNDER SEAL** |
| INDIANA NEWSPAPERS, INC., an | ) | |
| Indiana corporation, publisher of THE | ) | |
| INDIANAPOLIS STAR, owned by | ) | |
| GANNETT CO., INC., a foreign | ) | |
| corporation, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Susan J. Guyett ("Plaintiff"), was a reporter for The Indianapolis Star

(the "Star"), which is published by Indiana Newspapers, Inc., and owned by Gannett Co.,

Inc. ("Gannett") (collectively "Defendants").  In December 2008, Plaintiff was laid off in

the second of a series of four reductions in force ("RIFs") at the Star.  In her Complaint,

Plaintiff, who was fifty-nine years old when her employment with the Star was

terminated, alleges that Defendants discriminated against her on the basis of her age, in

violation of the Age Discrimination in Employment Act ("ADEA").  Defendants now

move for summary judgment.  For the reasons set forth below, Defendants' motion is

**DENIED**.

1

# I. Background

## A. Plaintiff's Employment with the Star

Plaintiff began her career as a journalist approximately thirty-five years ago. (Deposition of Susan Guyett ("Guyett Dep.") 15:19-16:16). In 1978-79, Plaintiff worked for a Gannett newspaper in New York. (*Id.* at 17:22-20:20). From the time she left that Gannett newspaper in 1978-79 to the time she became employed by the Star in 2000, Plaintiff was not employed by a Gannett newspaper. (*Id.* at 20:21-28:5; 180:4-16).

In 1999, Plaintiff began working as a freelance writer of the Cityscape column for the Star. (*Id.* at 26:20-27:13). In November 2000, the Star offered Plaintiff employment, and she accepted. (Deposition of James Keough ("Keough Dep.") 71:24-74:11; Guyett Dep. 27:10-16; 29:8-19; 107:25-108:16). Her job classification was Reporter I. (Plaintiff's Sealed Ex. 3, List of Reporter I's as of December 2008 ("Reporter I's List") at 2). The column's name changed in 2004 from Cityscape to Talk of Our Town. The department to which Plaintiff was assigned was referred to as either My Life or Features. (Guyett Dep. 43:1-9; Deposition of Dennis Ryerson ("Ryerson Dep.") 211:5-9). That same year, Plaintiff was promoted to a full-time employee. (Guyett Dep. 98:24-99:9; 108:17-19). Plaintiff also occasionally wrote "Table Talk," a column in the food section, breaking news stories, filed stories online, and contributed to feature stories. (Guyett Dep. 105:5-17). In November 2007, the Star assigned Plaintiff an overall rating of three or higher in her final performance appraisal, meaning that her job performance was meeting or exceeding the Star's expectations. (Plaintiff's Ex. 13, Susan Guyett

Performance Review (Manager's Assessment) ("Assessment")).

**B.     The Collective Bargaining Agreement**

During her employment with the Star, Plaintiff was a member of the Indianapolis Newspaper Guild (the "Guild"), the union for the Star's editorial and building services department employees.  (Guyett Dep. 73:1-12; Plaintiff's Ex. 10, Excerpts from Collective Bargaining Agreement ("CBA") at 1).  At the time of Plaintiff's termination, the Guild and the Star were parties to a CBA.  (CBA at 1).  The CBA contains a seniority provision, which states that "[s]eniority rights of each employee shall be respected in regard to reduction of staff, outstanding ability considered."  (CBA at 11).  The CBA provides no further explanation of how seniority rights "shall be respected."  (CBA). When calculating an employee's seniority, the Star uses the date of hire for the "most recent, continuous employment stretch of any Gannett newspaper."  (Keough Dep. 73:4-24).  Accordingly, Guyett's seniority date is November 22, 2000.  (Guyett Dep. 107:25-108:16; Keough Dep. 71:24-74:11).

**C.     Reductions in Force**

Since 2003, the Star has conducted four reductions in force ("RIFs").  During this time, newspapers were facing financial troubles due to decreased revenue and the continuing decline in the economy.  (Plaintiff's Sealed Ex. 9, Letter from Kane to Star Employees ("Kane Letter"); Guyett Dep. 119:24-120:24).

Dennis Ryerson ("Ryerson") is the Editor and Vice President at the Star, meaning he is the head of all news for the newspaper.  (Ryerson Dep. 29:9-11; 45:5-46:25).  In

July 2008, Michael Kane ("Kane"), the Star's President and Publisher, notified Ryerson that Ryerson would need to implement a RIF in August 2008. (Ryerson Dep. 48:11-22; 59:19-60:5). Specifically, Ryerson was ordered to reduce the headcount by nine employees. (*Id.* at 80:11-23). Ryerson and James Keough ("Keough"), the Star's Vice President of Human Resources, discussed ways to organize the RIF. (*Id.* at 59:19-60:3). Keough suggested categorizing employees by division, department, and job classification. (*Id.* at 59:19-60:3; 61:6-10).

Ultimately, Ryerson laid off seven employees in the August 2008 RIF, three of whom were under forty years old and three others who were over forty years old but younger than Plaintiff at the time. (*Id.* at 80:21-23; Declaration of James Keough ("Keough Decl.") ¶ 4). No reporters were laid off in this RIF; however, five of the affected employees were members of the Guild. (Ryerson Dep. 83:12-14).

In November 2008, Kane notified the Star's employees of the need for a second RIF in order to reduce payroll expenses by ten percent, or roughly $980,000 and a headcount target of twenty. (Kane Letter; Ryerson Dep. 57:3-15). Plaintiff was aware of the budget cuts and RIF. (Guyett Dep. 124:24-125:12). Ryerson was again in charge of the RIF. (Ryerson Dep. 57:3-15). Of the factors he considered in deciding which jobs to eliminate, Ryerson considered seniority to be paramount. (*Id.* at 89:16-24).

To begin the process of elimination, Ryerson and Todd Moore ("Moore"), his Administrative Editor, generated lists of newsroom employees. (Reporter I's List; Plaintiff's Exs. 5-8 RIF Spreadsheets 1st-4th Round Vetting; Ryerson Dep. 55:1-25;

73:11-75:17).  Again, Ryerson divided the newsroom employees by division, department, and job classification.  (Keough Dep. 97:14-19; Ryerson Dep. 58:11-25).  Ryerson decided not to include any reporters from hard news departments, such as business, community news, sports, and others, in the December 2008 RIF, because those departments serve the basic function of the newspaper.  (Ryerson Dep. 93:2-15; 129:5-15).  On the other hand, the Features/My Life department was included in the RIF, because it was not high on Ryerson's priority list and required a different kind of reporting.  (*Id.* at 129:5-15).  In other words, a person may be a good features reporter, but cannot cover community news.  (*Id.* at 121:15-122:5; 129:5-15).  Ryerson believed it would be easier for a new reporter to continue the Talk of Our Town column than to move into a community news reporting position.  (*Id.* at 121:15-122:5).

### D.    Plaintiff's Termination

Initially, Ryerson did not include Plaintiff on a list of employees being considered for termination.  (*Id.* at 112:25-113:12).  In an email to Keough on November 10, 2008, Ryerson suggested that Plaintiff should not be terminated, because he believed she covered "a very unusual beat" and was "uniquely qualified to handle it."  (Plaintiff's Ex. 82, Email String 11.10.08 ("Keough Email")).  Accordingly, he contemplated making an exception for Plaintiff under the "outstanding ability" caveat in the CBA, even if she had less seniority than other employees who were terminated.  (Ryerson Dep. 226:24-229:9).

The list that Ryerson eventually used to determine RIF candidates was prepared by Moore and consisted of thirteen reporters from the My Life department, including

Plaintiff. (*Id.* at 68:10-20; Ryerson Dep. Ex. 3). Ryerson did not consider three of the reporters on the list, because they worked on the Metromix publication, which he considered to be a separate department within the My Life section, apart from regular Features. (Ryerson Dep. 162:11-164:12; 167:9-168:3; Declaration of Dennis Ryerson ("Ryerson Decl.") ¶ 5). Additionally, Andrea Alumbaugh ("Alumbaugh") was excluded from consideration, because she was a temporary employee whose employment was scheduled to end; therefore, her inclusion in the RIF would not aid in reaching the target. (Ryerson Dep. 169:6-170:4). Abraham Aamidor ("Aamidor") left voluntarily. (*Id.* at 128:11-14). Finally, Ryerson excluded Jolene Ketzenberger ("Ketzenberger") under the outstanding ability exception to the CBA's seniority provision. (*Id.* at 40:25-42:4; 168:4-15). Of the seven employees left on the list, Ryerson selected the three employees with the least seniority, which included Plaintiff, Christopher Lloyd, and Whitney Smith. (Ryerson Dep. 68:10-22; Ryerson Dep. Exs. 3, 5). When asked why he changed his mind about making an exception for Plaintiff due to her "outstanding ability," Ryerson responded that he "thought more deeply about the quality of her work and whether somebody else could indeed do the work . . . . [a]nd rethinking what the definition of outstanding ability truly would be." (Ryerson Dep. 250:3-252:17).

On December 3, 2008, Ryerson, along with a human resources representative, called the employees affected by the RIF to the conference room and told them that their positions were being eliminated. (*Id.* at 133:1-16). Plaintiff also was handed a letter stating that her position was "being eliminated." (Plaintiff's Ex. 12, Letter from Ryerson

6

to Plaintiff ("RIF Letter")).  Ryerson does not recall whether he told Plaintiff that the Star was only eliminating her job, not the Talk of Our Town column.  (Ryerson Dep. 137:13-17).  Plaintiff was fifty-nine years old on the day of her termination.  (Reporter I's List; Guyett Dep. 11:25-12:1).  Five reporters in the My Life department who were not terminated were younger and had less seniority than Plaintiff; however, three more senior reporters from the same department who were within the protected age class, and one of whom was older than Plaintiff, also were not terminated in the RIF.  (Reporter I's List; Ryerson Dep. 162:11-170:21; Keough Dep. 128:1-129:18; 131:12-16; Keough Decl. ¶ 4).

### E.     Plaintiff's Replacement

At the time he terminated Plaintiff, Ryerson knew that he wanted to continue the Talk of Our Town column.  (Ryerson Dep. 135:18-136:5).  Ryerson briefly considered Carime Ritchie ("Ritchie"), who at the time had worked for the Star for less than five months and was twenty-three years old, as a possible replacement for Plaintiff.  (Ryerson Dep. 144:15-145:8).  Ultimately, however, Ryerson asked Cathy Kightlinger ("Kightlinger"), who was thirty-nine years old at the time, to begin writing Talk of our Town after consulting with a few managing editors.  (Deposition of Cathy Kightlinger ("Kightlinger Dep.") 50:6-7; Ryerson Dep. 99:19-100:11).

Ryerson transferred Kightlinger from the Community News Department into the My Life Department just two days after Plaintiff's termination.  (Kightlinger Dep. 69:24-70:25; Ryerson Dep. 100:2-14; 136:13-137:6).  Yet, Ryerson spared the Community News Department reporters from the RIF, because he felt that the function of that

department was "more critical." (Ryerson Dep. 120:12-121:14). As far as Kightlinger's ability, she received the same overall rating as Plaintiff on her recent performance appraisal. (Plaintiff's Sealed Ex. F, Cathy Kightlinger Performance Appraisal at 10).

Kightlinger called Plaintiff on December 8, 2008, to inform Plaintiff that she had been "assigned to cover [Plaintiff's] beat," and that she could be reached at Plaintiff's old number. (Kightlinger Dep. 99:2-19). In a December 9, 2008, email to Star employees, Jacqueline Thomas informed the staff that Kightlinger had been transferred to the My Life Department. (Plaintiff's Ex. 15, Email from Thomas to Star Newsroom ("Thomas Email")). Kightlinger's first Talk of Our Town column appeared in the December 11, 2008, issue of the Star. (Plaintiff's Ex. 76, Dec. 11, 2008, Talk of Our Town).

Ryerson wrote a column announcing Kightlinger as the new Talk of Our Town author, writing that she is "enthusiastic, curious, and loves connecting with people. She appreciates the need to temper work with fun just as a strong community knows how to play every bit as much as it knows how to work." (Plaintiff's Ex. 18, Dennis Ryerson Column ("Ryerson Column")). His description of her attributes was based on the descriptions of her from other people at work. (Ryerson Dep. 157:25-158:13). In a new photograph taken of Kightlinger for the column in 2009 or 2010, she is wearing a sleeveless dress while smiling with her head cocked to one side. (Plaintiff's Ex. 20, Sept. 20, 2010, Talk of Our Town Column). Two years later, in October 2010, the Star promoted Kightlinger and gave her a pay raise. (Plaintiff's Sealed Ex. 111, Position Change of Kightlinger; Ryerson Dep. 239:18-25).

## F.    New CBA and Additional RIFs

In December 2008, the Guild filed a grievance against the Star on behalf of eight employees, including Plaintiff.  (Guyett Dep. 137:9-17).  The Guild claimed that the Star's management violated the seniority provision of the CBA in that management looked at seniority within divisions and departments rather than straight seniority across divisions and departments.  (Keough Dep. 54:3-22; Guyett Dep. 137:9-17).  Eventually, the Guild withdrew the grievance in exchange for the signing of a new CBA, which contained a new seniority provision permitting management to consider job classifications, individual skills and abilities, and individual performance history and disciplinary history, in addition to seniority, when conducting RIFs.  (Plaintiff's Ex. 11, New CBA at 11, 30).  The Star conducted another RIF in 2009, affecting seventeen employees in Ryerson's newsroom.  (Ryerson Dep. 86:8-9).  The October/November 2010 RIF did not affect anyone in the newsroom.  (*Id.* at 241:11-22).

## II.    Motion for Summary Judgment Standard

Summary judgment shall be granted if the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Disputes as to a material fact are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When analyzing a motion for summary judgment, the court construes all facts and reasonable inferences in favor of the non-moving party.  *See id.* at 255.  The court must avoid the temptation to "make credibility

determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

## III. Discussion

Plaintiff asserts that she was impermissibly terminated due to her age. The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" due to that individual's age. 29 U.S.C. § 623(a)(1). To establish a violation of the ADEA, Plaintiff must show that her age must have played an actual role in the Star's decision-making process and had a determinative influence on the outcome, which was the termination of her employment. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008). *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).

An employee may bring an ADEA claim via the direct or indirect method of proof. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010) (citation omitted). Plaintiff proceeds under both the (A) direct and (B) indirect methods.

## A.    Direct Method

To prevail under the direct method, Plaintiff must offer direct evidence of animus; in other words the smoking gun, or "circumstantial evidence that establishes a discriminatory motive on the part of the employer through a longer chain of inferences." *Id.* at 298.  Circumstantial evidence may include "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005).  Still, the circumstantial evidence presented "must point directly to a discriminatory reason for the employer's action;" otherwise, Plaintiff must proceed under the indirect method. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Because Plaintiff does not have direct evidence of animus, she attempts to use circumstantial evidence to prove discrimination under the direct method.

Even when viewed as a whole, Plaintiff's circumstantial evidence does not establish by the direct method a discriminatory motive on the part of the Star.  To support her claim of age discrimination, Plaintiff relies on Ryerson's oral and written statements that her position was being eliminated; her replacement within two days by a younger Kightlinger; the retention of less senior reporters in Plaintiff's department; Ryerson's

11

description of Kightlinger as enthusiastic and curious; the new photograph of Kightlinger used for the column; Kightlinger's and Plaintiff's equal performance ratings in their most recent reviews; Kightlinger's subsequent raise; and the transfer of Kightlinger from the news department, which was spared from the RIF.

First, use of the term "eliminated" was correct in that several reporters were terminated without new reporters hired as replacements. The Star had to continue publishing a complete newspaper, simply with fewer employees. The purpose of the RIF was to reduce headcount, and the fact that each employee affected by the RIF received the same form layoff memo stating that his or her position was being eliminated was not ambiguous when taken in context. Second, the fact that Plaintiff was replaced within two days by a younger Kinghtlinger is not suspicious enough to infer age discrimination. Ryerson needed to find a new author quickly in order for the Talk of Our Town column to continue with little interruption. While Kightlinger was younger than Plaintiff, other reporters who were older than Plaintiff at the time were not terminated in the RIF, and reporters who were Kightlinger's age were terminated. Thus, some similarly-situated employees outside the protected class were treated no better than Plaintiff, which does not point directly to age discrimination. Furthermore, the characteristics used to describe Kightlinger, enthusiastic and curious, are not limited to young employees. Similarly, the photograph of Kightlinger in a sleeveless dress with her head slightly cocked does not constitute circumstantial evidence of age discrimination. The image reveals a fraction of Kightlinger's shoulders, and having one's head cocked to the side is a traditional pose.

Using such descriptions or photos does not create an inference of age discrimination. Finally, Kightlinger's raise, which she received nearly two years after being assigned to Talk of Our Town and in conjunction with a promotion, is too far removed from the December 2008 RIF to be considered circumstantial evidence of age discrimination. On the other hand, Kightlinger's transfer from the "critical" news department and the similarity of Kightlinger's and Plaintiff's performance reviews do create suspicion regarding the Star's motive behind including Plaintiff in the RIF. While these circumstances do not point directly to age discrimination, they may indicate pretext as discussed below.

Ultimately, these pieces of evidence do not create a convincing mosaic that would allow a jury to infer intentional discrimination by Ryerson.

## B. Indirect Method

Plaintiff also proceeds under the indirect method, which requires that Plaintiff establish a prima facie case of age discrimination using the *McDonnell Douglas* formula. *Egonmwan v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 845, 849-50 (7th Cir. 2010). Accordingly, Plaintiff must show that (1) she is a member of the protected class; (2) she was performing well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003). If Plaintiff establishes all of the elements of a prima facie case, the burden shifts to Defendants to offer a legitimate, nondiscriminatory reason

for the adverse employment action. *Id.* If Defendants meet this burden, the burden shifts back to Plaintiff to demonstrate that the reasons offered were pretextual. *Egonmwan*, 602 F.3d at 850.

Defendants concede the first three elements, but argue that Plaintiff cannot satisfy the fourth element; however, the fourth element is intertwined so closely with the pretext inquiry of whether the Star's reasons for terminating Plaintiff and replacing her with Kightlinger were pretextual that the court will consider them together. *Currie v. Paper Converting Mach. Co., Inc.*, 202 Fed.Appx. 120, 122 (7th Cir. 2006) (citations omitted) (finding the fourth element of the prima facie case so closely intertwined with the pretext inquiry that the court considered them together). The pretext inquiry turns on "whether the employer's stated reason was honest, not whether it was accurate." *Rudin*, 420 F.3d at 727 (citation and internal quotation marks omitted). Ultimately, "once the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury - not the court." *Id.* at 726 (internal quotation marks and citation omitted).

Defendants insist that the Star had legitimate, non-discriminatory reasons for conducting the RIF, for the way in which it implemented the RIF, and for including Plaintiff in it. Plaintiff does not challenge Defendants' proffered reason for conducting the RIF - that economic conditions forced the Star to reduce its headcount. Instead, Plaintiff challenges Defendants' reasons for the decision to limit the RIF to reporters in the My Life department and to exempt reporters with less seniority than Plaintiff.

Defendants contend that the December 2008 RIF was limited to the My Life Department, because Ryerson did not want to lose reporters from the more "critical" hard news department. Subjecting only certain departments to a RIF is permissible if the employer sets forth a legitimate business justification for doing so. *See Shollenbarger v. Planes Moving & Storage*, 297 Fed.Appx. 483, 486 (6th Cir. 2008) (holding that the defendant met its burden of providing a legitimate business justification for its decision to subject only certain departments to the RIF, which happened to be staffed pre-dominantly by females). Yet, two days after the Star terminated Plaintiff, Ryerson transferred Kightlinger, a similarly situated employee outside the protected class, from Community News, which was exempt from the RIF, to the My Life department to replace Plaintiff. Also raising suspicion are Kightlinger's and Plaintiff's comparable performance ratings and Kightlinger's lack of seniority over Plaintiff. Replacing Plaintiff with Kightlinger indicates that the news reporters were not indispensable, as Ryerson claimed, and casts doubt on the legitimacy of the Star's stated reason for Plaintiff's termination versus reporters in the hard news department with less seniority.

Plaintiff also argues that Defendants' exemption of less senior reporters in the My Life department from the December 2008 RIF is evidence of pretext. The CBA allows consideration of outstanding ability when reducing the staff; however three reporters for Metromix, which is within the My Life department, were exempt from the RIF by virtue of the fact that they wrote for Metromix, not because they exhibited outstanding ability. Each of these reporters was less senior than Plaintiff and ranged in age from 25 to 31.

Ryerson defends their exemption by defining Metromix as a young adult publication that is separate from general features, while at the same time acknowledging that Metromix is a subdepartment of the My Life department.  Unfortunately, Ryerson's attempt to justify the exemption of Metromix reporters does not quell the suspicions the exemption raises.  Although Ryerson's desire to retain young reporters for the young adult publication is understandable, the CBA requires respect for seniority, with exceptions only for outstanding ability.  The Metromix reporters were not exempt for outstanding ability.  Ryerson's continuous narrowing of departments into subdepartments in order to spare less senior reporters from the RIF is evidence of pretext.  In other words, the Metromix reporters may not have been exempt from the RIF because their department was excluded, but rather were exempt due to Ryerson's desire to retain young reporters for Metromix.

Ryerson's explanation for protecting hard news reporters from the RIF contradicts his decision to remove Kightlinger from Community News to replace Plaintiff.  Additionally, his decision to spare the Metromix reporters because Metromix is a subdepartment of the My Life department suggests a pretext for sparing young reporters from the RIF.  Plaintiff has cast doubt on the Star's proffered reasons for the termination, and, accordingly her claim of discrimination is to be determined by a jury.

IV.    Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket # 41) is **DENIED**.  Although this entry cites exhibits filed under seal, the information

contained herein is no more revealing than what appears in the briefs or exhibits filed

publicly.  Still, the entry will be **UNDER SEAL** for a period ten (10) days from the date

it is filed, during which time the parties must show cause as to why it should remain

under

seal.  Otherwise, the entry will become public after the ten-day period.


**SO ORDERED** this 22nd day of December 2011.


_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Craig M. Borowski
BAKER & DANIELS - Indianapolis
cmborows@bakerd.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

John T. Neighbours
BAKER & DANIELS - Indianapolis
jtneighb@bakerd.com

Christopher S. Stake
DELANEY & DELANEY LLC
cstake@delaneylaw.net